

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

No. 06-19-00092-CR

CRAIG DEALLEN DAVISON, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 188th District Court
Gregg County, Texas
Trial Court No. 45,860-A

Before Morriss, C.J., Burgess and Stevens, JJ.
Opinion by Justice Burgess

# OPINION

The main participants in this sordid tale of kidnapping and murder are Craig DeAllen Davison, Dustin Bennett, Patricia Baker (a/k/a Crickett), Dakeilen Nelson, and Kevin Stephenson. Nelson and Stephenson are the victims. Bennett confessed to kidnapping and murdering Nelson and Stephenson, and Baker pled guilty to assisting Bennett in kidnapping them. The present case involves the State's aggravated kidnapping charges against Davison.

The State's theory at trial was that Davison, "acting with intent to promote or assist the commission of the offense[s], . . . solicit[ed], encourage[ed], direct[ed], aid[ed] or attempt[ed] to aid" Bennett and Baker in kidnapping Nelson and Stephenson and was therefore guilty of aggravated kidnapping under the law of parties. TEX. PENAL CODE ANN. § 7.02(a)(2). At trial, Davison did not contest that Bennett kidnapped and murdered Nelson and Stephenson or that Baker assisted Bennett in kidnapping them; rather, he simply denied that he was involved in those offenses. A Gregg County jury disagreed and found Davison guilty of two counts of aggravated kidnapping,[1] and the trial court assessed him a punishment of fifty-four years' imprisonment after finding the State's enhancement allegations to be true.

On appeal, Davison challenges the legal sufficiency of the evidence supporting his convictions under the law of parties, contends that the trial court abused its discretion in admitting evidence of certain extraneous wrongful acts, and contends that the trial court reversibly erred by failing to instruct the jury regarding the law of parties in the application portion of its jury charge. Because we find (1) that legally sufficient evidence supports Davison's conviction, (2) that

---

[1] *See* TEX. PENAL CODE ANN. § 20.04(b).

Davison was not egregiously harmed by the trial court's jury-charge error, and (3) that (a) Davison's complaints regarding the admission of extraneous wrongful acts evidence were forfeited in some instances and, (b) as for the preserved complaints, the trial court did not abuse its discretion in admitting the evidence, we affirm the trial court's judgment.

## I.      Legally Sufficient Evidence Supports Davison's Convictions

### A.      Standard of Review

In his first and second issues, Davison challenges the sufficiency of the evidence supporting his convictions on two counts of aggravated kidnapping. "In evaluating legal sufficiency, we review all the evidence in the light most favorable to the trial court's judgment to determine whether any rational jury could have found the essential elements of the offense beyond a reasonable doubt." *Williamson v. State*, 589 S.W.3d 292, 297 (Tex. App.—Texarkana 2019, pet. ref'd) (citing *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010) (plurality op.); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Hartsfield v. State*, 305 S.W.3d 859, 863 (Tex. App.—Texarkana 2010, pet. ref'd)). "Our rigorous legal sufficiency review focuses on the quality of the evidence presented." *Id.* (citing *Brooks*, 323 S.W.3d at 917–18 (Cochran, J., concurring)). "We examine legal sufficiency under the direction of the *Brooks* opinion, while giving deference to the responsibility of the jury 'to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.'" *Id.* (quoting *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Jackson*, 443 U.S. at 318–19; *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007)). In drawing reasonable inferences, the trier of fact "may use common sense and apply common knowledge, observation, and experience gained in the

ordinary affairs of life." *Duren v. State*, 87 S.W.3d 719, 724 (Tex. App.—Texarkana 2002, pet. struck) (citing *Manrique v. State*, 994 S.W.2d 640, 649 (Tex. Crim. App. 1999) (Meyers, J., concurring)). As the trier of fact, the jury is the sole judge of the credibility of the witnesses and the weight to be given their testimony and may "believe all of a witnesses' testimony, portions of it, or none of it." *Thomas v. State*, 444 S.W.3d 4, 10 (Tex. Crim. App. 2014). We give "almost complete deference to a jury's decision when that decision is based on an evaluation of credibility." *Lancon v. State*, 253 S.W.3d 699, 705 (Tex. Crim. App. 2008).

In our review, we consider "events occurring before, during and after the commission of the offense and may rely on actions of the defendant which show an understanding and common design to do the prohibited act." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (quoting *Cordova v. State*, 698 S.W.2d 107, 111 (Tex. Crim. App. 1985)). It is not required that each fact "point directly and independently to the guilt of the appellant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Id.* Since circumstantial evidence and direct evidence are equally probative in establishing the guilt of a defendant, guilt can be established by circumstantial evidence alone. *Ramsey v. State*, 473 S.W.3d 805, 809 (Tex. Crim. App. 2015); *Hooper*, 214 S.W.3d at 13 (citing *Guevara v. State*, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004)). Further, we consider all the evidence admitted at trial, whether it was properly admitted or not. *See Moff v. State*, 131 S.W.3d 485, 489–90 (Tex. Crim. App. 2004).

"Legal sufficiency of the evidence is measured by the elements of the offense as defined by a hypothetically correct jury charge." *Williamson*, 589 S.W.3d at 298 (quoting *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)). "The 'hypothetically correct' jury charge is 'one

4

that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried.'" *Id.* (quoting *Malik*, 953 S.W.2d at 240).

Under the statute and the indictment, to obtain the convictions for aggravated kidnapping, the State was required to show, beyond a reasonable doubt, that on or about March 22, 2016, (1) Davison (2) intentionally or knowingly (3) abducted Nelson and Stephenson (4) by restricting the movements of Nelson and Stephenson without their consent so as to interfere substantially with their liberty by moving them from one place to another, with the intent to prevent their liberation, (5) by secreting or holding them in a place where they were not likely to be found, and (6) that Davison did then and there use or exhibit a deadly weapon, to-wit, a firearm, during the commission of the offense. *See* TEX. PENAL CODE ANN. § 20.01(1)–(2) (Supp.), § 20.04(b). "A person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both." TEX. PENAL CODE ANN. § 7.01(a). "A person is criminally responsible for an offense committed by the conduct of another if[,] . . . acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense."[2] TEX. PENAL CODE ANN. § 7.02(a)(2); *In re State ex rel. Weeks*, 391 S.W.3d 117, 124 (Tex. Crim. App. 2013).

---

[2]"It is well settled that the law of . . . parties need not be pled in the indictment." *Williams v. State*, 410 S.W.3d 411, 414 (Tex. App.—Texarkana 2013, no pet.) (citing *Vodochodsky v. State*, 158 S.W.3d 502, 509 (Tex. Crim. App. 2005); *Marable v. State*, 85 S.W.3d 287, 287 (Tex. Crim. App. 2002)).

5

Therefore, in this case, we must determine whether there is legally sufficient evidence to show, beyond a reasonable doubt, that Davison, (1) acting with intent to promote or assist the commission of the offenses, (2)(a) solicited, (b) encouraged, (c) directed, (d) aided, or (e) attempted to aid (3) Bennett and/or Baker to commit the offenses. In determining whether Davison was a party to the offenses, we may consider "events before, during, and after the commission of the offense." *Gross v. State*, 380 S.W.3d 181, 186 (Tex. Crim. App. 2012) (quoting *Wygal v. State*, 555 S.W.2d 465, 468–69 (Tex. Crim. App. 1977)). "While an agreement of the parties to act together in a common design seldom can be proved by direct evidence, reliance may be had on the actions of the parties, showing by either direct or circumstantial evidence, an understanding and common design to do a certain act." *Barnes v. State*, 585 S.W.3d 643, 649 (Tex. App.—Texarkana 2019, pet. granted) (quoting *Barnes v. State*, 62 S.W.3d 288, 297 (Tex. App.—Austin 2001, pet. ref'd)); *see Ransom v. State*, 920 S.W.2d 288, 302 (Tex. Crim. App. 1994) (op. on reh'g) (citing *Cordova v. State*, 698 S.W.2d 107, 111 (Tex. Crim. App. 1985)). "Evidence is sufficient to convict under the law of parties if the defendant is physically present at the commission of the offense and encourages its commission by words or other agreement." *Barnes*, 585 S.W.3d at 649 (quoting *Rosillo v. State*, 953 S.W.2d 808, 814 (Tex. App.—Corpus Christ 1997, pet. ref'd) (citing *Ransom*, 920 S.W.2d at 302).

## B.     The Evidence at Trial

### 1.     Introduction and Overview of the Facts

The evidence showed that Davison owned a house in Hallsville, Texas, where many people came and went. There were allegations of rampant drug use and prostitution occurring at

6

Davison's house. Several witnesses testified that Davison claimed to be a member of the Bandidos motorcycle gang, although it was later established that he was not. Although Davison was thirty-one years older than Baker, the two of them were in a relationship of some sort. The record seems to show that Baker was at times Davison's lover, and at other times, she was a prostitute working for him in exchange for drugs. Many witnesses testified that Baker lived with Davison in his house and that Davison had a lot of control over her.

The events culminating in Nelson's and Stephenson's kidnappings and murders began when Baker suffered burns to her leg and spent five days in a burn unit in Dallas. When Baker was released, Davison traveled to Dallas to pick her up. When they returned to Davison's house, they found that Baker's wallet and a jewelry box containing Davison's mother's and deceased daughter's jewelry were missing. Davison believed that Nelson and Stephenson had stolen the items, and he was very mad at them.

When Nelson and Stephenson were subsequently at Davison's house, Bennett approached them with a shotgun. Baker retrieved zip ties and at one point held the shotgun on them while Bennett zip-tied their hands behind them. Bennett then put Nelson and Stephenson in their car and drove them to another location where he murdered them. During those events, Davison was purportedly having a seizure in the yard outside the house. Davison claimed he had no participation in those events at all due to his seizure; the State presented testimony to prove that Davison was faking the seizure and to show that he was involved in planning and executing those offenses. The case against Davison turned on whether and how much Davison was involved in those events.

7

### 2. The Witness Testimony

#### a. Patricia Baker's Testimony

##### i. Baker's Relationship With Davison

Baker was nineteen years old when Stephenson and Nelson were kidnapped and murdered. She testified that she had used methamphetamine from the age of sixteen until she was arrested in this case and that she had used Backpage[3] for prostitution since her eighteenth birthday. About eight or nine months before the kidnapping, she had contacted Davison,[4] whom she had met about one year earlier, and Davison began riding with her to her Backpage appointments. Within days, Davison suggested that Baker come stay with him as his caretaker so that she could find other employment and get away from prostitution, and Baker moved to his house. They began a sexual relationship the first day she moved in with him.

According to Baker, within one and one-half months, Davison wanted her to start prostituting through Backpage again. She did as he wished, and for two months, she used hotels accompanied by Davison, who would hide in the closet or bathroom during the appointments. Later, she began having appointments at Davison's house.

When Baker told Davison that she wanted to stop prostituting, he told her that she did not have a choice. She felt she could not say no or leave because she was afraid of Davison. She explained that he had verbally and physically abused her multiple times. She testified that Davison beat her with inanimate objects, put safety pins through her nipples, put a dog collar around her

---

[3]Testimony showed that Backpage is a website used by men and women to advertise and obtain escort and prostitution services.

[4]Davison was fifty years old at that time.

8

neck, made her sleep under the landing of the stairs, hit her in the back of the head with a rubber mallet, tied her up, and extinguished cigarettes in her vagina. Davison also told her that when she went out, he had people follow her, and he threatened both her and her family if she did not do what he told her to do. Davison kept her on drugs every day in order to control her, and she lived in a constant state of fear. Her attempts to reach out for help were unsuccessful since everyone was afraid of him because he told people he was a member of the Bandidos.

### ii. Baker's Burn Injury and Hospitalization

On February 23, 2016, Baker suffered third and fourth degree burns to her leg when she attempted to start a fire in the fireplace and her jeans caught on fire. Although Davison helped her put out the fire, he would not take her to the hospital. When Baker continued to scream, he threatened to spray carpet cleaner on the burn if she did not stop. He eventually poured a bottle of peroxide on the burn and told his then-girlfriend, Melissa, to take Baker to the hospital. Baker was transported by ambulance from the local hospital to a burn unit in Dallas, where she remained for five days. Davison and Melissa came to Dallas on the third or fourth day, and Baker returned to Davison's house with them when she was released. On the way back, they filled Baker's prescription for hydrocodone, then stopped at the Palace Inn in Longview to buy drugs from Nelson.[5]

---

[5]Nelson and Stephenson had been to Davison's house several times to visit Mary Jane Critchfield, who had stayed at Davison's house for a week in January. Stephenson and Critchfield were dating.

### iii. The Missing Wallet and Jewelry Box and Davison's Suspicion of Nelson and Stephenson

When Baker, Melissa, and Davison returned to Davison's house, they found that Baker's wallet and a jewelry box, containing jewelry that had belonged to Davison's mother and deceased daughter, had been stolen.[6] Davison came to believe that Nelson and Stephenson had stolen the items and was very mad at them.[7] Some days later, Nelson and Stephenson went to Davison's house and tried to convince him that they did not steal the items and to put the blame on Critchfield.

The next time Baker saw Nelson and Stephenson was on the day before the kidnapping when they came to Davison to have their car repaired. Although Davison was surprised that they came, he repaired their car. Bennett was also at the house when they came.[8] Baker went to Grammer's house, and when Baker returned that evening, Davison told her that he and Bennett had made a deal over a shotgun and that Nelson and Stephenson were supposed to bring back drugs and money.

### iv. The Upstairs Meeting

Later that night, Bennett, Mack Ballard, and Leia Clark went to Davison's house. Bennett, Ballard, and Clark went upstairs with Davison and talked for a couple of hours. Clark kept saying, "Don't do this, it's not a good idea, you know, it's okay, you can just leave right now." Ballard

---

[6]The stolen items were found five days later in a Longview motel trash can by Sandra Grammer.

[7]While in Dallas, Davison had left Critchfield a key to his house.

[8]Baker testified that she first met Bennett on February 28, the day she returned from the hospital. She also testified that Davison had her come on to Bennett to see if he would have sex with her because Davison wanted to watch. Baker testified that Davison forced her to have sex with other men, made her say she liked it, and recorded the encounters. Several recordings of Baker having sex with Davison and other men captured from Davison's cell phone were played. In the recordings, Davison was heard giving commands to Baker.

10

and Clark eventually left the premises, and Bennett and Davison remained upstairs talking. Davison then went downstairs and told her to message Nelson and Stephenson, to tell them that he was sick, and to ask them to please come back to his house. Davison did not appear to be sick to Baker. Davison went back upstairs and continued talking with Bennett. When Baker went upstairs, she heard, "[S]care them," referring to Nelson and Stephenson, and saw Bennett putting on gloves.

### v.     The Kidnappings

When Nelson and Stephenson came to the house, Baker, Davison, and Bennett were on the front porch. Davison told Baker to bring Nelson and Stephenson inside the house, and he told Bennett to go to the back of the house. Baker did as she was directed, and when they came inside, Davison began talking with Nelson and Stephenson to figure out why they had not come earlier. Then Bennett burst in dressed in all black, with his face covered and holding a shotgun. Stephenson screamed and ran upstairs, and Baker hid in a closet. Baker heard Stephenson screaming, "What are you doing? What's going on?" and heard Bennett yelling, "Get down, come back downstairs." She then heard Grammer calling her, and she went to the back porch where Davison lay on the ground in a seizure state, with Grammer beside him. Davison motioned to Baker with his hand, then told her to go inside and do whatever Bennett told her to do.

Baker went inside where Bennett was pacing and Stephenson was on the floor. Bennett told her to get something to bind his hands, and she found some zip ties. Bennett then gave Baker the shotgun, and Bennett bound Stephenson's hands. Baker then went to check on Davison, and Bennett told Nelson to come inside and lie on his stomach. Davison was no longer convulsing and

11

was lying on the porch; he did not look confused at all. Baker went back inside and both Nelson and Stephenson were bound and sitting on the floor. She asked them why they did not come back when they said they would and asked them where the gun was if they did not have the drugs or the money. Stephenson told her that the gun was in the car.

Baker went back out to the porch, and Lacy Simmons, who had driven Nelson and Stephenson to the house, gave Baker the keys to their car. Baker retrieved the gun, told Bennett that she had it, and told him to "just let them go." Bennett replied, "Or I can take them down a dirt road and get rid of them."[9] She told him it was up to him. He then put Nelson and Stephenson in their car and drove off with them. This happened around 5:00 a.m. After Bennett drove off, Davison got up, with Grammer's help, and they went inside and went to bed. Davison did not ask Baker about Bennett, Nelson, or Stephenson and did not ask what had happened.

### vi.     Bennett Returned to the House

Around 9:00 a.m., Bennett and Ballard returned to the house. Davison asked Bennett how he got there, and Bennett said Ballard picked him up. Davison then called Baker into the living room and asked her why she had not followed Bennett and given him a ride back, then chewed her out for not doing so. Bennett left for a few minutes and returned with the shotgun, took it apart, and put the parts in a white cardboard box. When he and Ballard left, Bennett did not take the box with him.

---

[9]Nelson's and Stephenson's bodies were found in a wooded area near some railroad tracks in the southwest part of Longview.

Shortly after Bennett was arrested, Davison and Baker received a telephone call from him from jail, and he said, "Whatever I left at your house can you get rid of it[?]" Baker testified that Davison did not seem surprised by that request. Davison told her later that he had wanted to get Nelson and Stephenson back to the house to scare them and that he had told Bennett not to take it too far. A couple of days after the incident, Davison smashed a cell phone left by Nelson and Stephenson with a hammer.

### vii. Baker's Cross-Examination Testimony

On cross-examination, Baker testified that Davison had back and neck problems and seizures. She said that as time went on, his seizure episodes became more unbelievable, although she acknowledged that some of them were real. She also testified that she and Davison injected methamphetamine every day and that Davison also smoked it.

Baker admitted that she had given three statements to law enforcement, on April 22, 2016, June 20, 2016, and December 12, 2018, and that she had pled guilty to aggravated kidnapping on December 21, 2018. In her last statement, Baker told law enforcement for the first time that Davison abused her and that she was afraid of him. She maintained that in her first two statements, she was trying to protect Davison and that she told the detective that he did not have anything to do with it. Baker also testified that she had a plea deal before she gave her last statement to the police.

### b. Sandra Grammer's Testimony

Grammer met Davison and Baker the week before Baker went to the hospital with her burns. While Baker was in the hospital, Grammer found Baker's purse at a motel, and it contained

13

items that belonged to Davison's mother or to his daughter. When she brought the purse to Davison's house, she stayed to take care of Davison and Baker. She was living at Davison's when the kidnappings occurred.

Grammer testified that the day before the kidnappings, Nelson and Stephenson had brought their car out, and Davison looked under the hood. At some point, Nelson and Stephenson left together. She remembered Davison saying he had been burglarized, and she did not dispute that she had given a statement to detectives in which she claimed that Davison had said that Nelson and Critchfield had something to do with the burglary.

She remembered Nelson and Stephenson coming back out to the house and that Bennett showed up. She thought they were trying to scare Nelson and Stephenson. About the time Nelson and Stephenson showed up, Davison stepped out and began having a seizure, which she described as him shaking and his eyes rolling back. She did not know how long the seizure lasted, but said it seemed like forever. During the seizure, Davison told her continuously to stay close to him. She believed that Davison had a seizure at that time, but she acknowledged that Davison could have fabricated and exaggerated it. She testified that she, Baker, and Davison fell asleep on the porch and were awakened when Bennett started the car with Nelson and Stephenson inside. Davison then got up on his own, and they went inside to go to bed.

Grammer described Davison as vindictive and manipulative and testified that Davison was very cruel to Baker in both his words and actions. She testified that Davison would get upset with Baker, tell her to pack her bags, and make her stand by his truck for hours. According to Grammer, Davison had Baker under so much control that it was not hard to convince her to do certain things.

14

Grammer also gave examples of when Davison was cruel to her. When he wanted Grammer to have sex with Baker and she refused, Davison drug Grammer by the hair and said that he would hurt Baker if she did not do it; another time, he threatened Grammer, and she woke up the next morning with her wrists tied to the bedpost.

### c.   Lacy Simmons's Testimony

Simmons was a prostitute and friends with Stephenson. She first met Davison a few hours before the kidnapping. She accompanied Stephenson, his son, and Courtney Brantley to Davison's house. Stephenson, Brantley, and Davison had some business in the shop, and Stephenson put something shaped like a rifle or a shotgun covered with cloth into the trunk of the car, then they went back to Simmons's room.

About 3:00 or 4:00 the next morning, Stephenson and Nelson got her to drive them back to Davison's. Simmons explained that Davison had texted Stephenson or Nelson and said that he was not feeling well and needed to smoke some weed. When they got there, she and Nelson stayed in the car until they heard Stephenson yelling, "[N]o, no, please," and saw a man on the back porch hit the floor. They walked up and saw a man with a bandana on his face and tattoos holding a 12-gauge shotgun walking Stephenson down the stairs. As they neared the back porch, they saw Davison convulsing and two women trying to help him. By the time they got to the porch, Stephenson was lying on his stomach on the floor. Davison then tried to tell her that she was not supposed to be there.

Simmons remembered telling the police that Davison grabbed his chest and began to act like he was having a seizure and that she thought that was odd. She also told the police that

Davison would not let her go into the house and backed her out of the door. At trial, she maintained that one of the women kept her from going into the house. Davison then sent her home with Joshua Bruce. After that, she communicated with Davison and Baker by text, but never went back to the house because she was afraid.

### d.      Joshua DeWayne Bruce's Testimony

Joshua Bruce testified that he had known Davison for a couple of months before the kidnappings. During those two months, he went to Davison's house quite often. The only time he saw Nelson and Stephenson there was on the night of the kidnappings. As he recalled, he went to the house shortly after dark and stayed about forty-five minutes. Davison was with him upstairs for a very short time, then went downstairs. He remained upstairs smoking drugs by himself. He heard a door open downstairs, and then Stephenson came running upstairs in a panic. Bennett was behind him wearing black with a bandana over his face and holding a shotgun. Bennett led Stephenson back downstairs. Once downstairs, Bennett had Stephenson on his knees.

Bruce went to the back porch where Davison was having a seizure. Simmons and Nelson were also there. He described Davison as shaking, with his eyes closed, and in a fetal position. Bruce said the shaking lasted from the time he came outside until he left, which was about ten to fifteen minutes. He thought the shaking was more like Davison was cold than having a seizure. But he also said that the event was similar to other times he had seen Davison have a seizure. At one point, Bennett came outside and told him to get some zip ties, which he did. When he came back outside, Davison told him to get Simmons out of there.

16

Bruce did not know whether Davison took any medication for his medical condition, but he did not see him take any and did not see any around the house. Davison used methamphetamine daily. According to Bruce, Davison ran things around his house, and nothing would have gone on inside of his house without his knowledge. He recalled telling the detectives that Davison was a jerk to Baker and Grammer and that Davison had a controlling relationship with Baker. He also recalled that Davison told him that Nelson and Stephenson had robbed his house and that Davison was not happy about it. Davison also told him that he was a member of the Bandidos.

### e.      William Arlington (Mack) Ballard's Testimony

Ballard testified that he met Davison one afternoon in March 2016, when he went with Bennett and Clark to Davison's house to make a drug deal. They wanted to trade guns for drugs, but they were not there when Nelson and Stephenson came to the house. They left after about thirty minutes, but they returned later when Davison told Bennett that the drugs were there. When they arrived, Bennett went into the house and Ballard and Clark remained in their car. After about thirty minutes, Clark went into the house.

When Clark returned, she told Ballard that they did not have all the drugs, so he tried to call and text Bennett to tell him it was a setup. Bennett told them to go ahead and leave. Ballard testified that he never saw Nelson and Stephenson. He remembered that he told the police that he had seen Bennett, Davison, Baker, and Grammer inside talking, that it appeared they had a plan to do something stupid, and that he tried to talk Bennett out of it.

Some time later, Davison told Ballard that he saw Bennett coming to him with a gun deal as an opportunity to get back at Nelson and Stephenson for robbing him. Davison also told Ballard

17

that he and Clark were not supposed to be there when Bennett came back for the drugs. Davison apologized to him, but said it was too late to stop it. Ballard claimed that he found out about the two bodies when Bennett got arrested.

After the kidnappings, Ballard's daughter came to him because Davison was driving by her house and texting her. Ballard confronted Davison, who apologized and said that he did not know she was his daughter. Davison told him that the threatening texts were meant for Michael Shane Wilson for running his mouth. Davison also told Ballard that he was a member of the Bandidos.

### f.      Michael Shane Wilson's Testimony

Wilson's ex-girlfriend was Ballard's daughter, Krystal. He had an African-American friend called "Big," who weighed 500 pounds. After Nelson's and Stephenson's bodies were found, Big called Wilson and told him some information that Wilson shared with Krystal. Wilson then received six or seven text messages from Davison in which Davison threatened to drag him behind his motorcycle and said that he could thank Big for that.[10] Wilson knew that Krystal had talked to Ballard about the messages.

Wilson also acknowledged that he told the police that he saw Davison's truck drive by his house a few times. Wilson was afraid to talk to the police because he was worried about retaliation from Davison. He explained that Davison had told him that he was an assassin for the Bandidos.

---

[10]Wilson testified that Davison actually used a racial slur to refer to Big, and because Big was African-American, he understood that Wilson was referring to Big.

Wilson believed him at first and thought that he was dangerous. He was told later that Davison was neither an assassin for nor a member of the Bandidos.

### g. Heather Shields's Testimony

Shields met Davison in November 2015, when she and her boyfriend went to buy motorcycle parts from him. Davison was also a high school friend of her stepfather. After meeting him, Shields went to his house once or twice a month to check on him or to take some drugs out there. After the kidnappings, she overheard a conversation between her boyfriend and Chad Parker in which Parker said something had happened to two guys at Davison's house. Shortly after that, her boyfriend told her that he did not want her going to Davison's house anymore.

After Davison was arrested, her stepfather asked her to go see Davison in jail because Davison kept calling him. She visited Davison two times. The second time, Davison scared her, saying that people were following her. After Davison said that she could stay at his house, she asked if he did it there because she did not want to stay there if that were the case. Davison then pulled the phone away from his mouth and mouthed that he did it. Davison then told her that he had told the people how to do it and how to cover it up. He also told Shields that he was a member of the Bandidos.

### h. Summer Evans's Testimony

Evans met Davison two or three weeks before April 22, 2016, the day a search warrant was served on him. She had helped Davison rework some plumbing to his shower. While they were working together, Davison told her that he had the gun that was used to kill Nelson and Stephenson,

19

that it had been stolen from the police, and that he had gotten rid of it. Evans did not recall telling the police that Davison told her that he did not do it.

### i. Medical Testimony

#### 1. Justin Morris, M.D.

Justin Morris, M.D., was with the SWAT team when the search warrant was executed on Davison. After Davison surrendered, Morris medically assessed him because Davison said that he felt like he was going to have a seizure. When he checked Davison's vital signs, he found nothing abnormal. Morris explained that when a seizure is coming on, a person may experience an aura and be able to communicate prior to the seizure. Once the seizure begins, the person will be unable to communicate.

Morris testified that seizures typically last one or two minutes. He explained that during a seizure, the muscles that aid breathing cannot work effectively, so having a seizure lasting longer than two minutes could lead to major medical issues. In his experience, a person having a seizure cannot communicate. After the seizure stops, the person enters into the postictal period in which they are lethargic and weak. During the postictal period, they may be able to respond, but they are very confused. Their symptoms improve as the postictal period progresses. This period generally lasts fifteen to twenty minutes.

#### 2. Rajani Caesar, M.D.

Rajani Caesar, M.D., a neurologist, treated Davison for a seizure disorder in January 2019. He tapered Davison off of one medication and added another one. Caesar testified that a person can look like they are having a seizure when they are not. He agreed that a typical seizure does

20

not last more than four minutes and that seizures lasting longer than that would cause serious medical issues.

### j. Law Enforcement Testimony

#### 1. Detective Chris Taylor

Detective Chris Taylor of the Longview Police Department (LPD) testified that he had extracted data from the cell phones of Baker, Evans, Simmons, Kayla Owens, and Elaina Grunden. Copies of the data from those cell phones, as well as a PowerPoint of text messages between Bennett and Chad Parker, Davison, Ballard, and Stephenson, were entered into evidence. He also testified that game cameras near the entrance of the road leading to where Nelson's and Stephenson's bodies were discovered showed a car entering the location at 6:08 a.m. and leaving the location at 6:35 a.m. on March 22, 2016.

Taylor was also on the team that executed the search warrant at Davison's house. They initially sought to clear the house with gas. After thirty to sixty minutes, they entered the house and found Davison hiding behind the air-conditioning duct work in an unfinished loft. Alejandro Castillo, an LPD detective, added that the team had called for the occupants to come out four times before they answered. Baker came out after fourteen minutes, Evans then came out, and Davison was escorted out about thirty minutes later.

#### 2. Detective Daniel Lhuiller

LPD Detective Daniel Lhuiller testified regarding his investigation into the murders of Nelson and Stephenson. Using cell tower data, he determined that the last location of Nelson's cell phone was a cell tower fairly close to Davison's home. He interviewed a number of people,

21

including Bennett, Davison, Baker, Grammer, Ballard, and Bruce. He interviewed Davison, Bennett, and Baker several times, and he noted that Bennett's story changed significantly in his second interview and changed again in his third interview. Baker's story partly stayed the same and partly changed drastically in her second interview. Based on his interviews, he believed Davison had knowledge of the kidnappings. He also testified that Bennett had confessed to the murders.

In Lhuiller's interview with Davison, Davison told him that Baker contacted Nelson and Stephenson and asked them to come to the house to smoke marihuana with Davison because he was sick. Davison also told him that he had a seizure on the back porch and that Simmons came up to him and said that she loved him. Davison told Lhuiller that he told Simmons to have Bruce take her home.

### C. Analysis

#### 1. Davison's Sufficiency Argument

In his brief, Davison attacks one of the State's theories at trial, i.e., that Davison manipulated Baker and others to do his will, and argues that the evidence was insufficient to establish Davison's manipulation and control of Baker. However, that ignores the abundant evidence showing Davison's participation in the kidnappings irrespective of any evidence of manipulation. Viewed in the light most favorable to the jury's verdict, the evidence of Davison's statements and actions before, during, and after the kidnappings show that he was a party to the kidnappings of Nelson and Stephenson.

22

The testimony of several witnesses showed that Davison blamed Nelson and Stephenson for the burglary of his house that occurred a few weeks before the kidnappings. Davison's statements to Ballard revealed that he viewed Bennett's desire to trade Nelson and Stephenson a firearm in exchange for drugs as an opportunity to get revenge on the two young men. The evidence also showed that before Nelson and Stephenson returned with the drugs, Davison arranged for Bennett to return to his house, where they talked privately for several hours before Bennett began dressing. A jury could reasonably infer that the purpose of those talks was to plan their strategy and to prepare for its execution.

When the plan was ready for execution, Davison directed Baker to contact Nelson and Stephenson to get them to come immediately, claiming he was sick. When the young men arrived, Davison directed Baker to bring them in and directed Bennett to go outside in preparation for his entrance. After Bennett burst in and began the process of binding the young men, Davison continued to aid in the execution, directing Baker to assist Bennett in any manner Bennett wanted. Within hours after the kidnappings and murder of the young men, Bennett returned to Davison's house, and Davison scolded Baker for not following Bennett to give him a ride back. Bennett also left the murder weapon with Davison, and Davison admitted to Evans that he had disposed of it. The jury could reasonably infer, based on the context of their conversation, that when Davison told Shields that he had done it and that he had told others how to do it and cover it up, Davison was referring to the kidnappings and murders of Nelson and Stephenson.

Based on this evidence, any reasonable jury could find beyond a reasonable doubt that Davison acted with intent to promote or assist the kidnappings by soliciting, encouraging,

23

directing, and aiding Bennett and/or Baker to commit the offenses. Therefore, we find that sufficient evidence supports the jury's verdict.

## 2. Davison's Challenge to Baker's Testimony as an Accomplice Witness

Nevertheless, Davison asserts that Baker was an accomplice as a matter of law and that, absent her testimony, there is no evidence that connects him with the kidnappings. We agree that Baker was an accomplice as a matter of law. Nevertheless, non-accomplice evidence tends to connect Davison to the kidnappings.

### a. The Law Regarding Accomplice-Witness Testimony

Under Texas law, "[a] conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed . . . ." TEX. CODE CRIM. PROC. ANN. art. 38.14; *Zamora v. State*, 411 S.W.3d 504, 509 (Tex. Crim. App. 2013). "An accomplice is someone who participates with the defendant before, during, or after the commission of a crime and acts with the required culpable mental state." *Druery v. State*, 225 S.W.3d 491, 498 (Tex. Crim. App. 2007). A witness is an accomplice as a matter of law when the witness has been charged with the same offense as the defendant or a lesser-included offense, but the charges are dismissed in exchange for the witness's testimony against the defendant, or "[w]hen the evidence is uncontradicted or so one-sided that no reasonable juror could conclude that the witness was not an accomplice." *Ash v. State*, 533 S.W.3d 878, 886 (Tex. Crim. App. 2017). In this case, Baker was charged with and pled guilty to the aggravated kidnappings of Nelson and Stephenson. Therefore, we find that she was an accomplice as a matter of law.

24

In determining whether the evidence was sufficient to connect the defendant with the committed offense, we eliminate all of the accomplice testimony and "examine[] the remaining portions of the record to see if there is any evidence that tends to connect the accused with the commission of the crime." *Castillo v. State*, 221 S.W.3d 689, 691 (Tex. Crim. App. 2007) (citing *Solomon v. State*, 49 S.W.3d 356, 361 (Tex. Crim. App. 2001)). The corroborating evidence by itself does not have to establish the defendant's guilt beyond a reasonable doubt, it simply needs to tend to connect the defendant to the offense. *Id.* There will be sufficient evidence if there was some non-accomplice evidence tending to connect the defendant to the commission of the offense. *Id.*

### b.     Analysis

The non-accomplice evidence in this case included the following:

- Simmons's testimony that the afternoon before the kidnappings, Stephenson had dealings with Davison and had a shotgun or rifle in the trunk of his car;

- Simmons's testimony that Stephenson and Nelson received a text at 3:00 or 4:00 the next morning from Davison that said he was not feeling well and needed to smoke some weed;

- Simmons's testimony that when she approached Davison on the porch, Davison tried to tell her she was not supposed to be there and sent her home with Bruce;

- Simmons's statement to the police that Davison would not let her go into the house that morning and backed her out of the door;

- Bruce's testimony that Davison had told him that Nelson and Stephenson had robbed his house and that he was not happy about it;

- Ballard's testimony confirming that he and Bennett wanted to trade guns for drugs;

25

- Ballard's testimony that he told the police that he had seen Bennett, Davison, Baker, and Grammer inside talking the morning of the kidnappings, that it appeared they had a plan to do something stupid, and that he tried to talk Bennett out of it;

- Ballard's testimony that some time after the kidnappings, Davison told him that he saw Bennett coming to him with a gun deal as an opportunity to get back at Nelson and Stephenson for robbing him;

- Ballard's testimony that Davison told him that Ballard and Clark were not supposed to be there when Bennett came back for the drugs and that Davison apologized and said it was too late to stop it;

- Ballard's testimony that Davison told him the threatening texts he sent to Ballard's daughter were meant for Wilson for running his mouth;

- Wilson's testimony that Davison sent him six or seven texts threatening to drag him behind Davison's motorcycle because Wilson's friend had told him what they had done;

- Shields's testimony that while visiting Davison in jail, Davison mouthed that he did it in response to her asking if he had been involved in what happened to Nelson and Stephenson and that Davison then told her that he had told the people how to do it and how to cover it up;

- Evans's testimony that Davison told her that he had the gun used to kill Nelson and Stephenson and that he got rid of it;

- Detective Taylor's testimony that Davison refused to exit his residence when the search warrant was served and that he was found hiding behind the duct work above the loft.

Taken together, this evidence tends to connect Davison to the kidnappings. *See* TEX. CODE CRIM. PROC. ANN. art. 38.14. Since the non-accomplice evidence tends to connect Davison to the offense, we overrule Davison's first and second issues.[11]

---

[11]Davison also contends that the State had a "break in its proof" because there were other persons present who could have prevented the kidnapping. Specifically, he contends that Baker could have demanded the release of the young men when she had a rifle in her hands. Davison does not explain how the fact that Baker, who pled guilty for her part

26

## II. Davison Was Not Egregiously Harmed by Jury Charge Error

In his fifth issue, Davison complains that the trial court reversibly erred by failing to include instructions on the law of parties in the application paragraph of its jury charge. We agree that the trial court erred, but we find that Davison was not egregiously harmed by the failure to instruct on the law of parties in the application paragraph of the jury charge.

### A. Standard of Review

"Our review of alleged jury charge error involves a two-step process." *Sanders v. State*, 387 S.W.3d 680, 689 n.3 (Tex. App.—Texarkana 2012, pet. struck) (citing *Abdnor v. State*, 871 S.W.2d 726, 731–32 (Tex. Crim. App. 1994)). "Initially, we determine whether error occurred and then evaluate whether sufficient harm resulted from the error to require reversal." *Wilson v. State*, 391 S.W.3d 131, 138 (Tex. App.—Texarkana 2012, no pet.) (citing *Abdnor*, 871 S.W.2d at 731–32).

"[T]he jury is the exclusive judge of the facts, but it is bound to receive the law from the court and be governed thereby." TEX. CODE CRIM. PROC. ANN. art. 36.13. "A trial court must

---

in the aggravated kidnappings, had an opportunity to prevent the kidnappings would constitute a "break in proof" or vitiate the liability of Davison in the planning, aiding, and directing of the kidnappings.

Davison argues that *Beeman v. State*, 828 S.W.2d 265 (Tex. App.—Fort Worth 1992, pet. ref'd), holds that the presence of someone to whom the victim can appeal for help vitiates a defendant's liability for aggravated kidnapping. We disagree. In *Beeman*, the defendant was convicted of aggravated kidnapping when he forced a convenience store clerk into an open storeroom and sexually assaulted her. The defendant fled when a bell rang, indicating a customer had entered the store. *Id*. at 266–67. Although the court of appeals reversed the conviction, the presence of the customer was not relevant to its decision. Rather, the court noted that the indictment alleged that Beeman had abducted the victim, "without her consent, with intent to prevent her liberation, by secreting and holding her in a place where she was not likely to be found, the storeroom," at the convenience store. *Id*. at 266. The evidence at trial showed that the storeroom area was visible to anyone using the restroom at the store. The court reasoned that if a customer entered the store without the clerk at the counter, "it [was] not unlikely that the customer would go back to the rest room-storeroom [sic] area to see if the clerk were there." *Id*. at 267. Consequently, the court held that the State had not shown beyond a reasonable doubt that Beeman took his victim "to a place where she was not likely to be found." *Id*. Therefore, *Beeman* does not support Davison's argument.

submit a charge setting forth the 'law applicable to the case.'" *Lee v. State*, 415 S.W.3d 915, 917 (Tex. App.—Texarkana 2013, pet. ref'd) (quoting TEX. CODE CRIM. PROC. ANN. art. 36.14). "The purpose of the jury charge . . . is to inform the jury of the applicable law and guide them in its application. It is not the function of the charge merely to avoid misleading or confusing the jury: it is the function of the charge to lead and prevent confusion." *Id.* (quoting *Delgado v. State*, 235 S.W.3d 244, 249 (Tex. Crim. App. 2007)). "In examining the charge for possible error, reviewing courts 'must examine the charge as a whole instead of a series of isolated and unrelated statements.'" *Vasquez v. State*, 389 S.W.3d 361, 366 (Tex. Crim. App. 2012) (quoting *Dinkins v. State*, 894 S.W.2d 330, 339 (Tex. Crim. App. 1995)). The trial court errs when the jury is not charged with the law applicable to the case. *See Phillips v. State*, 463 S.W.3d 59, 64–65 (Tex. Crim. App. 2015).

If we find error, then we analyze that error for harm. *See Abdnor*, 871 S.W.2d at 731. "The standard to determine whether sufficient harm resulted from the charging error to require reversal depends upon whether appellant objected." *Id.* at 732. When, as here, the defendant did not object to the charge, we will not reverse unless the record shows that the error resulted in egregious harm, *Ngo v. State*, 175 S.W.3d 738, 743–44 (Tex. Crim. App. 2005) (citing *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984) (op. on reh'g)), such that the defendant did not receive a fair and impartial trial. *See Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984) (op. on reh'g); *Loun v. State*, 273 S.W.3d 406, 416 (Tex. App.—Texarkana 2008, no pet.). "Jury-charge error is egregiously harmful if it affects the very basis of the case, deprives the defendant of a valuable right, or vitally affects a defensive theory." *Stuhler v. State*, 218 S.W.3d 706, 719

28

(Tex. Crim. App. 2007). In making this determination, we review "the entire jury charge, the state of the evidence, the argument of counsel, and any other relevant information in the record as a whole." *Villarreal v. State*, 205 S.W.3d 103, 106 (Tex. App.—Texarkana 2006, pet. dism'd, untimely filed) (citing *Almanza*, 686 S.W.2d at 171). Direct evidence of harm is not necessary to establish egregious harm. *Hutch v. State*, 922 S.W.2d 166, 171 (Tex. Crim. App. 1996).

## B. Analysis

### 1. The Jury Charge Was Erroneous

"The application paragraph is that portion of the jury charge that applies the pertinent penal law, abstract definitions, and general legal principles to the particular facts and the indictment allegations." *Vasquez v. State*, 389 S.W.3d 361, 366 (Tex. Crim. App. 2012) (citing *Gray v. State*, 152 S.W.3d 125, 127–28 (Tex. Crim. App. 2004); *Hutch v. State*, 922 S.W.2d 166, 170 (Tex. Crim. App. 1996)). Since it "specifies the factual circumstances under which the jury should convict or acquit, it is the 'heart and soul' of the jury charge." *Id.* at 367.

When the abstract portion of the charge contains a definition or instruction on a theory of law, such as the law of parties,

the application paragraph must

(1) specify "all of the conditions to be met before a conviction under such theory is authorized";

(2) authorize "a conviction under conditions specified by other paragraphs of the jury charge to which the application paragraph necessarily and unambiguously refers"; or

(3) "contain[] some logically consistent combination of such paragraphs."

29

*Id.* (quoting *Plata v. State*, 926 S.W.2d 300, 304 (Tex. Crim. App. 1996), *overruled on other grounds by Malik v. State*, 953 S.W.2d 234 (Tex. Crim. App. 1997)). When the application paragraph makes no mention of the law of parties, either directly or indirectly, it is erroneous. *Id.* (citing *Plata*, 926 S.W.2d at 304).

In this case, the jury charge contained instructions on the law of parties in the abstract portion—but made no mention of the law of parties in the application paragraph. Consequently, we find that the jury charge was erroneous because the application paragraph failed to mention the law of parties.

### 2. There Was No Egregious Harm

Under an *Almanza* analysis, we first look to the entire jury charge and "ask whether anything in the balance of the jury charge either exacerbated or ameliorated th[e] error." *French v. State*, 563 S.W.3d 228, 236 (Tex. Crim. App. 2018). The abstract portion of the charge contained the following instructions on the law of parties:

> A person is criminally responsible as a *"Party"* to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or both. Each party to an offense may be charged with commission of the offense.

> A person is *"Criminally Responsible"* for an offense committed by the conduct of another if, acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense.

> Mere presence alone will not constitute one a party to a crime.

The application paragraphs immediately followed an instruction on venue. The charge also instructed the jury that the charge contained the rules that must control its deliberations.

30

Consequently, we do not believe that a reasonable jury would have ignored the instruction on the law of parties in deciding whether Davison had been proved guilty or not. Therefore, we find that the remainder of the jury charge ameliorated the charge error.

Examination of the state of the evidence shows that there was no question that the only theory under which Davison could be found guilty was as a party. The evidence showed that during the kidnappings, Davison remained on the back porch. There was no evidence that he physically participated in the capture and binding of Nelson and Stephenson or in transporting them to the wooded area where their bodies were found. However, as set forth above, there was ample evidence from which the jury could find that Davison was a party to the kidnappings based on his actions and directions to Bennett and Baker before the kidnappings, his directions to Baker during the kidnappings, his actions after the kidnappings, and his statements to Ballard, Shields, and Evans admitting his involvement in the offenses.

Regarding the third factor, in its final argument the State read the instruction on the law of parties and argued that Davison was a party to the offenses before, during, and after the kidnappings. The State also pointed to specific facts in the evidence that it argued showed that Davison promoted and assisted, solicited, encouraged, directed, and aided in the kidnappings. It also pointed to the timeline of events and argued that it showed that Davison planned the kidnappings with Bennett. Davison also argued that the only way to convict him was to show that he had planned and executed the kidnappings.

Regarding other relevant information, the State informed the jury in voir dire that the case was based on the law of parties and spent a considerable amount of time educating the jury about

31

the theory of party liability. Davison also educated the jury about party liability during voir dire.

Our analysis of the four *Almanza* factors leads us to the conclusion that Davison was not egregiously harmed by the omission of any instruction on the law of parties in the application paragraph of the jury charge. Therefore, we overrule Davison's fifth issue.

## III. Davison's Evidentiary Complaints

Davison's third and fourth issues complain that the trial court erred when it admitted evidence of Davison's extraneous wrongful acts and evidence whose probative value was substantially outweighed by its danger of unfair prejudice, confusing the issues, and misleading the jury. Davison briefed these issues together and provided a list of instances in which the trial court allegedly erred in overruling his objection or in admitting evidence. Because we find that Davison in some instances forfeited his complaint and that, in the others, the trial court did not abuse its discretion by admitting the evidence, we will overrule his third and fourth issues.

### A. Davison's Forfeited Complaints

#### 1. Video Recordings

At trial, the trial court permitted the State to publish three recordings taken from a cell phone shared by Baker and Davison that showed Baker having sex with Davison and two other men and in which Davison commands or directs Baker to perform certain things. Davison objected before their publication to the jury. However, the recordings were contained in the data from the cell phone that had previously been admitted without objection.

To preserve a complaint for our review, a party must first present to the trial court a timely request, objection, or motion stating the specific grounds for the desired ruling if not apparent from

the context. TEX. R. APP. P. 33.1(a)(1). To be timely, "[t]he objection must be made at the earliest possible opportunity." *Martinez v. State*, 867 S.W.2d 30, 35 (Tex. Crim. App. 1993) (citing *Turner v. State*, 805 S.W.2d 423, 431 (Tex. Crim. App. 1991)). Since Davison did not make a timely objection when the evidence was admitted, this complaint has not been preserved for our review. *See Pina v. State*, 38 S.W.3d 730, 736 (Tex. App.—Texarkana 2001, pet. ref'd).

> **2.    Testimony that Davison Claimed to be a Member of and Assassin for the Bandidos and Photographs of the Zip-tied Hands of Nelson and Stephenson**

Over Davison's objections, the trial court admitted testimony from Wilson that Davison had told him that Davison was a member of and an assassin for the Bandidos. However, four other witnesses testified that Davison had also told them that he was either a member of or an assassin for the Bandidos, without objection. The trial court also admitted, over Davison's objections, four photographs depicting the hands of Nelson and Stephenson bound with zip ties taken after their bodies were discovered. However, a police officer subsequently described the contents of each photograph without objection.

"To preserve error . . . , a party must object each time the inadmissible evidence is offered or obtain a running objection." *Lane v. State*, 151 S.W.3d 188, 193 (Tex. Crim. App. 2004) (quoting *Valle v. State*, 109 S.W.3d 500, 509 (Tex. Crim. App. 2003)). Reversal is not required for the erroneous admission of evidence when the same evidence was received without objection. *Id.*; *see Brown v. State*, 696 S.W.2d 913, 914 (Tex. Crim. App. 1985) (noting that the admission of a photograph is not erroneous when testimony showing the same thing is admitted without objection). Since Davison did not object and did not obtain a running objection to this evidence

33

when it was admitted through the testimony of other witnesses, he failed to preserve this issue for our review. *Lane*, 151 S.W.3d at 193; *Brown*, 696 S.W.2d at 914.

### 3. Baker's Use of Backpage for Prostitution

Davison also objected at trial to the relevance of Baker's testimony that she used Backpage and obtained a running objection to it when the trial court overruled his objection. However, before Davison's objection, Baker had testified extensively about her use of Backpage for the purposes of prostitution. Because Davison failed to make a timely objection when the evidence was first admitted, this complaint has not been preserved for our review. *See Pina*, 38 S.W.3d at 736.

### 4. Instances of Davison's Physical Abuse of Baker

At trial, Baker was asked why she felt she could not say no to Davison or leave his house. She answered that she was afraid of him. When asked why she was afraid of Davison, she answered, "Because on multiple occasions he has abused me, he has beat me with inanimate objects. *One time he put safety pins through my nipples*, *put a dog collar around my neck and made me sleep under the landing of the stairs.*" (Emphasis added). After she completed her answer, Davison objected "as to extraneous evidence" and was overruled.

On appeal, Davison complains that the trial court erred in admitting the italicized portion of the testimony in violation of Rules 403 and 404(b) of the Texas Rules of Evidence. Regarding his complaint that admission of this testimony violated Rule 403,[12] "[t]o preserve error, a party

---

[12]*See* TEX. R. EVID. 403 ("The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence.").

must object and state the grounds for the objection with enough specificity to make the trial judge aware of the complaint, unless the specific grounds were apparent from the context." *Thomas v. State*, 505 S.W.3d 916, 924 (Tex. Crim. App. 2016) (citing TEX. R. APP. P. 33.1(a)(1)). "The objection must be sufficiently clear to give the judge and opposing counsel an opportunity to address and, if necessary, correct the purported error." *Id*. "If a trial objection does not comport with arguments on appeal, error has not been preserved." *Id*. Davison's objection was not sufficiently clear to make the trial court aware that he was making a Rule 403 complaint. Consequently, since his trial objection does not comport with his complaint on appeal under Rule 403, this complaint has not been preserved.

Davison's objection at trial was arguably sufficient to alert the trial court that he was objecting under Rule 404(b).[13] As we have previously noted, to preserve a complaint, any objection must be timely. "A complaint is timely if it is made 'as soon as the ground of objection becomes apparent.'" *Pena v. State*, 353 S.W.3d 797, 807 (Tex. Crim. App. 2011) (quoting *Hollins v. State*, 805 S.W.2d 475, 476 (Tex. Crim. App. 1991)). "If a defendant fails to object until after an objectionable question has been asked and answered, and he can show no legitimate reason to justify the delay, his objection is untimely, and any claim of error is forfeited." *Luna v. State*, 268 S.W.3d 594, 604 (Tex. Crim. App. 2008).

In this instance, the ground of objection would have been apparent when Baker answered that Davison had abused her on multiple occasions, or at the latest when Baker went on to say that

---

[13]*See* TEX. R. EVID. 404(b)(1) ("Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.").

he beat her with inanimate objects. Nevertheless, Davison waited to object until after Baker went on to list three additional instances of abuse before making his objection. Since he has not shown any legitimate reason to justify his delay, we find that Davison's objection was untimely and that this complaint has been forfeited.

### 5. Baker and Grammer Having Sex

Davison also complains that the trial court admitted evidence that Baker and Grammer had sex together. Davison objected twice to that testimony. The first time he did not object until after the question had been asked and answered and the next question had begun to be asked. That objection was sustained by the trial court. Nevertheless, when the State asked Grammer again if she and Baker ever had sex together, Davison did not object until after Grammer answered both that question and the next. In addition, this same evidence came in without objection in Baker's testimony. Because Davison's objection was untimely and the same evidence was admitted through another witness without objection, he has forfeited this complaint. *See id*.; *Lane*, 151 S.W.3d at 193.

### 6. Forcing Baker to Have Sex with Others

Next, Davison complains that the trial court admitted evidence that Davison forced Baker to have sex with others. In the pages of the record cited by Davison in his brief, we find the following exchange:

> *Q.*     [By the State] Okay. And at any point did you ever see [Davison] have sex with [Baker] and it was not consensual?
>
> [Defense Counsel]: Objection, Your Honor.
>
> THE COURT: I'm going to overrule.

> *Q.*     (By [the State]) Did you ever see [Davison] force anything upon [Baker]?
>
> [Defense Counsel]:  Again, Your Honor, objection.
>
> THE COURT:  Overrule.

To preserve a complaint for appellate review, a timely objection must be made that states the specific ground for the objection, unless the ground is apparent from the context. *See* TEX. R. APP. P. 33.1; *Buchanan v. State*, 207 S.W.3d 772, 775 (Tex. Crim. App. 2006).  "A general or imprecise objection may be sufficient to preserve error for appeal, but only if the legal basis for the objection is *obvious* to the court and to opposing counsel." *Buchanan*, 207 S.W.3d at 775.  When the legal basis of a general objection is not obvious, "it does not serve the purpose of the contemporaneous-objection rule for an appellate court to reach the merits of a forfeitable issue that is essentially raised for the first time on appeal." *Id.* (footnotes omitted) (citations omitted).

A specific objection is required in order "to inform the trial judge of the basis of the objection and give him the opportunity to rule on it [and] to give opposing counsel the opportunity to respond to the complaint." *Resendez v. State*, 306 S.W.3d 308, 312 (Tex. Crim. App. 2009) (citing *Zillender v. State*, 557 S.W.2d 515, 517 (Tex. Crim. App. 1977)).  The objection "must be specific enough so as to 'let the trial judge know what he wants, why he thinks himself entitled to it, and do so clearly enough for the judge to understand him at a time when the trial court is in a proper position to do something about it.'" *Id.* at 13 (quoting *Lankston v. State*, 827 S.W.2d 907, 909 (Tex. Crim. App. 1992).

37

Davison did not apprise the trial court of the basis for the objections, which he asserts on appeal to be both Rules 403 and 404(b). However, the basis for those general objections was not obvious.[14] Further, evidence that Baker was forced to have sex with others was admitted without objection during Baker's testimony. Consequently, we find that this complaint was not preserved for our review. *See* TEX. R. APP. P. 33.1(a)(1)(A); *Buchanan*, 207 S.W.3d at 775; *Lane*, 151 S.W.3d at 193.

### B. Davison's Other Evidentiary Complaints

#### 1. Standard of Review

Relevant evidence is admissible unless it is barred by the United States or Texas Constitutions, a statute, the Texas Rules of Evidence, or other rules prescribed under a statute. TEX. R. EVID. 402. "Irrelevant evidence is not admissible." *Id*. "Evidence is relevant if . . . it has any tendency to make a fact more or less probable than it would be without the evidence[,] and . . . the fact is of consequence in determining the action." TEX. R. EVID. 401.

Under the Texas Rules of Evidence, evidence of other crimes, wrongs, or acts is not admissible "to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." TEX. R. EVID. 404(b)(1). But it may "be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake, or lack of accident." TEX. R. EVID. 404(b)(2). "The exceptions

---

[14]Although both Rule 403 and 404(b) objections are possible grounds, it is also possible that the objection was to the relevance of the testimony under Rule 402.

38

listed under Rule 404(b) are neither mutually exclusive nor collectively exhaustive." *De La Paz*, 279 S.W.3d at 343.

"Rule 404(b) is a rule of inclusion rather than exclusion." *Id.* (quoting *United States v. Bowie*, 232 F.3d 923, 929 (D.C. Cir. 2000)). "The rule excludes only that evidence that is offered (or will be used) solely for the purpose of proving bad character and hence conduct in conformity with that bad character." *Id.* (citing *Rankin v. State*, 974 S.W.2d 707, 709 (Tex. Crim. App. 1996)). "The proponent of uncharged misconduct evidence need not 'stuff' a given set of facts into one of the laundry-list exceptions set out in Rule 404(b), but he must be able to explain to the trial court, and to the opponent, the logical and legal rationales that support its admission on a basis other than 'bad character' or propensity purpose." *Id.* "Whether extraneous offense evidence has relevance apart from character conformity . . . is a question for the trial court." *Id.* (quoting *Moses v. State*, 105 S.W.3d 622, 627 (Tex. Crim. App. 2003)). The trial court must also balance between the probative value of the evidence and the counter factors set out in Rule 403, although that balance is slanted toward the admission of otherwise relevant evidence. *Id.*; *Montgomery v. State*, 810 S.W.2d 372, 387–88 (Tex. Crim. App. 1991) (op. on reh'g).

We review a trial court's ruling on the admissibility of extraneous wrongful acts under an abuse of discretion standard. *De La Paz*, 279 S.W.3d at 343; *Hernandez v. State*, 351 S.W.3d 156, 160 (Tex. App.—Texarkana 2011, pet. ref'd). If "the trial court's ruling is within the 'zone of reasonable disagreement,' there is no abuse of discretion," and we uphold the trial court's ruling. *De La Paz*, 279 S.W.3d at 343–44; *Hernandez*, 351 S.W.3d at 160. "A trial court's ruling is generally within the zone [of reasonable disagreement] if the evidence shows that 1) an extraneous

[act] is relevant to a material, non-[conformity] issue, and 2) the probative value of that evidence is not substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading of the jury." *De La Paz*, 279 S.W.3d at 344. Furthermore, the trial court's evidentiary ruling will not be disturbed if it is correct on any theory of law applicable to that ruling. *Id*.; *Hernandez*, 351 S.W.3d at 160–61.

We also review a trial court's Rule 403 determination for abuse of discretion. *Pawlak v. State*, 420 S.W.3d 807, 810 (Tex. Crim. App. 2013). If the ruling is within the zone of reasonable disagreement, there is no abuse of discretion. *James v. State*, 555 S.W.3d 254, 260 (Tex. App.— Texarkana 2018, pet. dism'd, untimely filed) (citing *De La Paz*, 279 S.W.3d at 343–44). Abuse of discretion in admitting the evidence will be found only if the danger of unfair prejudice substantially outweighed the probative value of the evidence. *Wheeler v. State*, 67 S.W.3d 879, 888 (Tex. Crim. App. 2002).

> In analyzing the trial court's Rule 403 ruling,
>
> we should consider (1) how compellingly evidence of the extraneous offense serves to make a fact of consequence more or less probable, (2) the potential that the extraneous offense will impress the jury in some irrational but indelible way, (3) the time needed to develop the evidence, and (4) the proponent's need for the extraneous offense evidence.

*James*, 555 S.W.3d at 260 (quoting *Hartsfield v. State*, 305 S.W.3d 859, 873 (Tex. App.— Texarkana 2010, pet. ref'd) (citing *Wheeler*, 67 S.W.3d at 888)). "Rule 403 favors admissibility, and 'the presumption is that relevant evidence will be more probative than prejudicial.'" *Id*. (quoting *Montgomery*, 810 S.W.2d at 389).

## 2. Evidence of Prostitution at Davison's House and Physical Abuse of Grammer and Baker

Over Davison's objections under Rules 403 and 404(b), the trial court allowed the State to introduce evidence of prostitution occurring at Davison's house, an instance of physical abuse by Davison of Grammer,[15] and additional instances of his physical abuse of Baker.[16] The State argues that these extraneous wrongful acts were admissible because they supported its theory that Baker assisted in the kidnappings at the behest of Davison because he had established domination over Baker through a campaign of abusive and controlling behavior that had left her afraid and emotionally dependent on Davison.

As we have previously noted, the State's prosecutorial theory of liability was that Davison was a party to the kidnappings by directing and aiding Bennett and Baker in the commission of the offenses. A supporting theory was that Davison was able to direct Baker to do as she was told by Bennett because of the extent of manipulation and control he exercised over Baker. The State sought to demonstrate the extent of his control over Baker and others by showing that they performed other acts at his direction, such as prostitution, and that they remained at his house even when he subjected them to verbal and physical abuse. Since showing that Davison forced Baker to engage in prostitution and physically abused both Baker and Bennett when they did not do what he wanted tended to make it more probable that Davison was able to exert an unusual amount of control over Baker such that she would be willing to follow his directions during the kidnappings,

---

[15]Grammer testified that when she attempted to resist Davison's request that she have sex with Baker by leaving, Davison pulled her by the hair and dragged her back.

[16]Baker testified that Davison put hot straighteners and extinguished his cigarette in her vagina. Davison preserved his objections to this evidence.

it is within the zone of reasonable disagreement that this evidence was relevant to a material, non-conformity issue. *See De La Paz*, 279 S.W.3d at 344.

We also must determine whether the probative value of the evidence is "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading of the jury." *Id*. To make this determination, we first consider how compellingly this evidence served to make a fact of consequence more or less probable. In this case, the evidence showed that Davison initially brought Baker to his house on the promise of getting her out of prostitution and helping her to become qualified for other employment. Nevertheless, within a couple of months, Davison pressured Baker to again resume prostitution to satisfy both an alleged economic necessity and Davison's prurient interests. When Baker protested, Davison told her that she did not have a choice. Likewise, Davison's additional severe acts of abuse of Baker showed the extent of Baker's subjection to and fear of Davison. So too, Davison's abuse of Grammer showed that he exercised control over others in his household, even when they had been there only a short time. Since these extraneous wrongful acts were compelling evidence of the extent of Davison's control over Baker, we find that this factor weighs strongly in favor of admitting the evidence.

We next consider the potential of the evidence to impress the jury in an irrational and indelible way. This factor examines the "evidence's tendency to tempt the jury into finding guilt on grounds apart from proof of the offense charged." *State v. Mechler*, 153 S.W.3d 435, 440 (Tex. Crim. App. 2005) (citing *Manning v. State*, 114 S.W.3d 922, 928 (Tex. Crim. App. 2003)). It considers the evidence's potential to unfairly prejudice the jury against the defendant. *See Manning v. State*, 114 S.W.3d 922, 927–28 (Tex. Crim. App. 2003). A limiting instruction can

42

minimize an impermissible inference of character conformity. *Lane v. State*, 933 S.W.2d 504, 520 (Tex. Crim. App. 1996).

Any unfair prejudice from the testimony that Davison forced Baker to resume prostitution was tempered by her testimony that she had engaged in prostitution for some time before living with Davison. The one act of abuse against Grammer had little potential to unfairly prejudice the jury against Davison. We find that this factor weighs in favor of admitting evidence of these two extraneous wrongful acts.

The additional acts of abuse against Baker were more shocking, and they had a greater tendency to prejudice the jury. However, this tendency was tempered somewhat by the trial court's limiting instruction in the jury charge that the jury could consider the evidence only for a limited purpose and that it could "not consider this evidence to prove that the defendant is a bad person and for this reason was likely to commit the charged offense." Nevertheless, we find that this factor weighs somewhat in favor of excluding the evidence.

The time needed to develop the evidence of these extraneous wrongful acts was minimal, consisting of only a few pages out of over 1,000 pages of the guilt/innocence record. This factor weighs in favor of admitting the evidence.

The State's need for the evidence also favors admitting the evidence. This evidence was needed to demonstrate the extent of Davison's control over Baker and the extent of Baker's fear of Davison. Further, the State's control theory was challenged repeatedly by Davison; some of the main themes of Davison's cross-examination of several witnesses was to attempt to establish

that Baker was free to do what she wanted, that there was no control over her exercised by Davison, and that Davison's action were misinterpreted because of the use of illegal drugs.

Under these circumstances, we find that the trial court was within the zone of reasonable disagreement when it concluded that the probative value of each of these extraneous wrongful acts was not substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. Consequently, we find that the trial court did not abuse its discretion in admitting the extraneous wrongful acts evidence. We overrule Davison's third and fourth issues.

## IV. Conclusion

For the reasons stated, we affirm the trial court's judgment.


Ralph K. Burgess
Justice


Date Submitted:     February 19, 2020
Date Decided:       April 2, 2020

Publish

44